| | | |
|---|---|---|
| BARBARA J. CAMPBELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 07 C 3752 |
| | ) | |
| MICHAEL ASTRUE, COMMISSIONER | ) | Judge Nan R. Nolan |
| OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Barbara J. Campbell claims that she is disabled due to anemia; hyperlipidemia (elevated levels of lipids in the blood); hypercholesterolemia (high blood cholesterol); hypertension; lower back pain; chest pain with shortness of breath; neck pain; esophageal reflux; obesity; anxiety disorder; panic attacks; and depression. She filed this action seeking review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. 42 U.S.C. §§ 416, 423(d). The parties have consented to the jurisdiction of the United States Magistrate Judge pursuant to 28 U.S.C. § 636(c), and Campbell has now filed a motion for summary judgment. For the reasons set forth here, the motion is denied and judgment is entered in favor of the Commissioner.

## PROCEDURAL HISTORY

Campbell applied for DIB on November 10, 2004, claiming that she became disabled on January 14, 2004 due to the combination of her various impairments, including anxiety, panic attacks, and depression. (R. 51, 77.) The application was denied initially on May 5, 2005, and again on reconsideration on September 7, 2005. (R. 29, 30.) Campbell appealed the decision and requested an administrative hearing, which was held on July 24, 2006. (R. 239.) On September 26, 2006, the Administrative Law Judge ("ALJ") denied Campbell's claim for benefits, finding that she is capable of performing a significant number of unskilled and sedentary jobs available in the

national economy. (R. 17-20.) The ALJ found that Campbell suffers from anxiety related disorder and panic attacks, but that these severe impairments do not alone or in combination prevent Campbell from performing a wide variety of "1, 2, [and] 3 step jobs." (R. 16-17.) In reaching this conclusion, the ALJ determined that Campbell's testimony regarding the frequency of her panic attacks was not supported by medical evidence. (R. 17-18.) Campbell now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner.

## FACTUAL BACKGROUND

Campbell was born on July 30, 1952 and was just a few days shy of her 54th birthday at the time of the hearing before the ALJ. (R. 52.) She received her GED in 1973 and lives with her husband in Elgin, Illinois. (R. 52-54, 82.) Campbell's past relevant work was in the banking industry where she spent two years as a receptionist before transferring to bookkeeping and installment loans. In the latter position, she performed activities such as returning checks for insufficient funds, answering customers' telephone questions, and pulling car titles. (R. 74-75, 246-47.) Campbell was laid off her banking job due to a departmental downsizing in January 2004. (R. 250-51.) Campbell attempted to return to full-time work at a mortgage company on December 13, 2005, but she suffered a panic attack several months later and never went back to work. The ALJ concluded that this did not qualify as substantial gainful activity ("SGA"). (R. 16, 68, 256.)

A.    **Medical History**

On May 20, 2001, Campbell reported to the Sherman Hospital emergency room complaining of lower back pain radiating to her front and chest, associated with shortness of breath. The doctor noted a past medical history of hypertension and elevated cholesterol, and diagnosed her with pleuritic pain. (R. 119-20, 127.) On August 22, 2001, Campbell was diagnosed with an abnormal GI tract, and shortly thereafter on November 19, 2001, she was diagnosed with essential hypertension, hypercholesterolemia, and esophageal reflux. (R. 128, 131-32.)

Campbell next saw a physician on August 13, 2003, when she called 911 from work due to shortness of breath, bilateral neck pain "associated with a nauseous feeling," and mild difficulty breathing. Campbell was admitted to Northwest Community Hospital where the doctor confirmed her earlier diagnoses of hypertension, hypercholesterolemia and esophageal reflux, and added that she also suffered from hyperlipidemia and anxiety disorder. (R. 137, 139, 141, 143.) A diagnostic x-ray showed clear lungs and no active disease. (R. 150.) The next day, Campbell underwent an echocardiogram due to her shortness of breath and near syncope (fainting). The test revealed normal left ventricular chamber dimensions with normal segmental wall motion and global ejection fraction; normal right ventricular, right atrial, and left atrial dimensions; trivial mitral insufficiency; mild tricuspid insufficiency with mild to moderate elevation of right ventricular systolic pressure and pulmonary artery pressure; and normal diastolic parameters. (R. 153-54.)

Approximately a year and a half later on February 7, 2005, Prabha Puri, Ph.D. conducted a mental status examination of Campbell at the request of the Illinois Department of Disability Determination Services ("DDS"). Dr. Puri found Campbell to be cooperative and oriented during the examination, but noted that she appeared anxious and "often shook her right leg or kept wringing her hands, possibly to reduce her anxiety." (R. 156.) Campbell told Dr. Puri that she started experiencing panic attacks, anxiety, and fear of dying when she turned 43, the age at which her mother had died of a heart attack. Campbell reported that during a panic attack, she experiences rapid heart beats and confusion; feels "[a]s if my heart could leave my body and jump out, which is frightening for me"; and suffers pain in her shoulder down to her arm. (*Id.*) Campbell stated that as a result of the attacks, she seldom leaves her home and avoids driving. According to Campbell, she spent the previous year staying home and watching movies or reading magazines. (*Id.*)

Dr. Puri found that Campbell's remote memory was intact, and concluded that she is "perfectly capable of managing her money for her own benefit." (R. 157.) Dr. Puri stated that

Campbell is capable of simple abstract thought, but found her judgment and insight to be below average. Based on her examination, Dr. Puri diagnosed Campbell with panic disorder, and concluded that she has impaired social and occupational functioning due to her panic attacks. Dr. Puri noted, however, that Campbell is "capable of leading a productive life if she is able to overcome her anxiety and panic attacks." (R. 158.)

On March 30, 2005, Jamison Allen, D.O. submitted a report stating that he had treated Campbell for the previous six years, and that she suffered from severe anxiety disorder with panic attacks, and from depression. Dr. Allen stated that medications helped alleviate Campbell's symptoms, but not enough to allow her to maintain regular employment. (R. 162.) According to Dr. Allen, Campbell had been unable to work for "the last two years" (i.e., since March 2003), but Campbell in fact had worked until January of 2004. Dr. Allen also stated that Campbell had "followed with a psychiatrist and therapist" for several years, but the only records of such treatment begin on April 7, 2005, when Campbell started seeing Karen Lake, LCSW, a licensed clinical social worker. In a report dated May 5, 2005, Ms. Lake reported that Campbell complained of panic attacks occurring twice per month, with rapid heart beat, shaking, shortness of breath, chest pain, nausea, arm pain, light headedness, depersonalization, fear of dying, ringing in ears, tingling sensation in arms, and disorientation. (R. 164.) Campbell told Ms. Lake that she had only been treated with Xanax in the past, and that the panic attacks were very disruptive to her work. (R. 165.)

Campbell reported that due to the panic attacks, she only does half the grocery shopping and is afraid to drive despite being able to do so. She is primarily interested in her family and prefers to be by herself, but she also attends church on a regular basis. (R. 164, 166.) Ms. Lake indicated that Campbell's mood and affect were congruent and anxious, but noted that she reported being somewhat "obsessed" with a fear of germs and food contamination. (R. 166.) Ms. Lake diagnosed panic disorder without agoraphobia, and also noted that Campbell had other medical

conditions including hypertension, high cholesterol, and esophageal reflux. (R. 168.) Ms. Lake concluded that Campbell was able to understand and carry out instructions, though she might be a little slow in completing tasks and require reassurance and reminders. Ms. Lake further stated that "customary work pressures" would increase Campbell's anxiety and trigger more panic attacks. (*Id.*)

Also on May 5, 2005, Carl Hermsmeyer, Ph.D performed a consultative Psychiatric Review Technique for the DDS. Dr. Hermsmeyer noted that Campbell suffers from an anxiety disorder, and found that she is mildly limited in her activities of daily living; and moderately limited in her ability to maintain social functioning, concentration, persistence, or pace. (R. 171, 176, 181.) Dr. Hermsmeyer also performed a Mental Residual Functional Capacity Assessment, finding Campbell to be moderately limited in the ability to understand, remember, and carry out detailed instructions, but without any other limitations in her ability to understand, maintain concentration and persistence, interact socially, and adapt. (R. 185-86.) In his handwritten notes, Dr. Hermsmeyer opined that Campbell's activities of daily living indicated that her panic disorder is not severe enough to meet or equal any mental listing, but is more than "non-severe." He noted that while Campbell may have difficulty understanding, remembering, and carrying out detailed instructions, she "retains the mental capacity to perform simple one and two-step tasks at a consistent pace." (R. 187.)

On June 9, 2005, Ms. Lake observed that Campbell had a drop in mood and experienced sleep disturbance with frequent waking; anger; crying; and anxiety, triggering panic attacks. (R. 235.) On June 28, 2005, Campbell reported that she still felt anxious but had not had any panic attacks. Her mood remained low, and Ms. Lake referred her to Dr. Syed Anwar, M.D. for a medical assessment. (R. 232-33, 235.) Dr. Anwar conducted a psychiatric evaluation of Campbell on August 4, 2005. Dr. Anwar found that she was "definitely" depressed and had fair concentration and memory, but that she was alert, oriented, cooperative, and not suicidal. He diagnosed major

depressive disorder, single episode, and gave her a global assessment functioning ("GAF") score of 45. (R. 233.) A GAF score of 41-50 denotes "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupation, or school functioning (e.g., no friends, unable to keep a job)." *See Dreyer v. Metropolitan Life Ins. Co.*, 459 F. Supp. 2d 675, 682 (N.D. Ill. 2006) (quoting DSM-IV: AXIS IV, GLOBAL ASSESSMENT OF FUNCTIONING (Am. Psychiatric Ass'n 2000)). *See also Jenkins v. Astrue*, No. 1:06-cv-0707-DFH-TAB, 2007 WL 2362982, at *2 n.2 (S.D. Ind. Aug. 14, 2007). Dr. Anwar recommended that Campbell continue taking Xanax, start taking Paxil, and return to see him the following month. (*Id.*)

On August 9, 2005, Dr. Allen completed a psychiatric report for the DDS confirming that Campbell was being treated for anxiety, panic attacks, and depression. (R. 191.) He stated that Campbell is able to perform activities of daily living by herself and has a normal relationship with her husband, but that she is anxious about work and finances, and has a flat affect. (R. 191-92.) Dr. Allen diagnosed Campbell with severe anxiety with panic attacks, and depression. He agreed that her symptoms are under fair control with Xanax, but concluded that she becomes too anxious and overwhelmed at work. (R. 194.)

Approximately nine days later on August 18, 2005, Ms. Lake completed an updated psychiatric report. Ms. Lake reported seeing Campbell weekly to every other week between April 7, 2005 and June 28, 2005. Aside from adding "major depressive disorder, single episode" to her diagnosis, Ms. Lake merely repeated the assessment she gave on May 5, 2005. (R. 207-11.) Ms. Lake's counseling notes from October 2005 indicated that Campbell had stopped going to church and was spending most of her time at home because she felt anxious all the time. Campbell reported having two or three panic attacks during the several months prior to her October visits with Ms. Lake. (R. 231.)

The next medical record was prepared by Dr. Allen following a February 18, 2006 office visit for hypertension, hypercholesterolemia, esophageal reflux, and anxiety. (R. 217.) Dr. Allen stated

that Campbell's hypertension was controlled with medication, and he recommended that she continue taking medications to help control her hypercholesterolemia and reflux. (R. 219-20.) As for Campbell's anxiety, he recommended that she continue taking Xanax and follow up with him if her symptoms worsened. At that time, Campbell stated that she did not feel the need to see a counselor or psychiatrist anymore. (R. 218, 220.) Dr. Allen indicated that Campbell's BMI (body mass index) at that time was 38.42 (obese), but he did not make further comment. (R. 218.) Several months later on June 9, 2006, Dr. Allen evaluated Campbell due to complaints of elevated blood pressure. (R. 223.) Dr. Allen stated that Campbell's hypertension was uncontrolled at that time and gave her a prescription for Diovan. (R. 225.) Dr. Allen instructed Campbell to continue taking Xanax for her anxiety disorder, and this time stated that she should follow up with her psychiatrist. (R. 226.) Campbell's BMI remained within the obese range at 38.07, but again, Dr. Allen made no further comment about it. (R. 224.)

## B. Campbell's Testimony

At the July 24, 2006 hearing, Campbell testified that she suffers panic attacks at least twice per month, during which she experiences chest pain, bloating in the stomach, rapid heart rate, and a feeling as if she is going to pass out. (R. 250, 266.) Campbell stopped working in January 2004 because she was laid off from her job at the bank, and not because of her panic attacks. Indeed, Campbell's last panic attack prior to her layoff occurred approximately three or four months earlier. (R. 251.) Campbell testified that her medication helped, and the bank did not have a problem with the sick days she took for the condition. (R. 252.) Campbell also stated that she tried to go back to work immediately after the layoff, but that "nobody was hiring me then" and she became discouraged and decided to quit. (R. 258-59.)

Campbell stated that she attempted to return to full-time work at a mortgage company in December 2005 because she wanted to "try and get out and go back to work again." (R. 253, 257.) Approximately one month into the new job, however, she drove home for lunch and then suffered

a panic attack. (R. 254.) Between December 2005 and her last day of work in June 2006, Campbell missed a total of about three or four days of work, used up her two personal days, and experienced anxiety and an increase in her blood pressure. (R. 256.)

Campbell testified that despite the panic attacks, she is able to drive around town, though she does not go too far because on one occasion the year before the hearing, she got lost. (R. 244.) In a Disability Report dated December 4, 2004, Campbell stated that she has panic attacks "all the time," and that they cause her to get depressed and experience chest pain and difficulty breathing. (R. 77, 78.) In an Activities of Daily Living Questionnaire completed on December 13, 2004, Campbell stated that as a result of her panic attacks, she feels frustrated and does not like to make decisions. She indicated that she cleans, dusts, and does laundry two or three days per week, and sometimes cooks meals. She grocery shops sometimes, though it makes her afraid, and she bathes and dresses herself. (R. 84-85.) Campbell estimated that she leaves the house two to three times a week to attend church, do errands, keep appointments, and visit family. She claimed that she gets nervous around other people, however, and worries about what she has said to them even days later. (R. 86.) Campbell stated that she loses her train of thought and "do[es] a lot of excessive worrying," and sometimes starts a new project before remembering to complete the previous one. At work, she would forget her daily routines. (R. 85.

On August 5, 2005, Campbell's husband submitted a Function Report - Adult Third Party on behalf of his wife. (R. 97-108.) Mr. Campbell stated that Campbell babysits, cooks three to four times per week; cleans, does laundry, and irons when she feels like it; nags; grocery shops; and worries about her children and grandchildren instead of her husband. Campbell cannot, however, dance, go to parties, or listen to her husband, and she does not fix her hair and nails everyday. (R. 97-98, 99-100.) Campbell is slow to dress and bathe but she does not require any special reminders to do so. (R. 98.) She does not leave home often, though she does attend church, and her anxiety affects her ability to concentrate, complete tasks, follow instructions, understand and

remember things, and get along with others. (R. 100, 101.) In an August 5, 2005 Activities of Daily Living Questionnaire, Campbell reported that she gets angry with neighbors, but she sometimes babysits and attends church. (R. 107-08.)

## C. Medical Expert Testimony

Dr. Kathleen O'Brien testified at the hearing as a Medical Expert ("ME"). The ME agreed that Campbell suffers from an anxiety disorder with panic attacks, plus some "physical difficulties," but opined that these impairments do not meet or equal any listing in the regulations. (R. 262, 263.) The ME noted that Campbell functions fairly well in her everyday life; is able to care for herself; is appropriate with other people; and is able to exercise adequate judgment. (R. 263.) In the ME's opinion, Campbell does have moderate limitations in pace and persistence, which could cause anxiety, and she would not be able to complete a normal workweek without interruption from her symptoms. (R. 263, 264-65.) The ME was unable to determine the frequency of the interruptions, noting that Campbell's symptoms ranged from mild to more difficult. (R. 265.) Nevertheless, the ME stated that Campbell would not be limited in her ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances. The ME explained that Cambpell's testimony suggested that she sometimes missed work due to physical symptoms, as opposed to anxiety. (*Id.*)

In the ME's view, there was a "general inconsistency in this [medical] record all the way through." (R. 269.) The ME noted that Campbell continued to work while she was being treated for anxiety and panic attacks between 2002 and 2004, and found nothing in the record – such as a change in medication or dosage – to explain why Campbell was suddenly unable to work in January 2004. (*Id.*) The ME further noted that despite the diagnosis of anxiety disorder with panic attacks, Campbell's treating physicians continuously found her to have high functionality. (*Id.*)

## D. Vocational Expert Testimony

Glee Ann Kehr, who testified at the hearing as a Vocational Expert ("VE"), characterized Campbell's past relevant work as sedentary and low, semiskilled. (R. 271.) The ALJ asked the VE whether an individual with Campbell's work experience, age (53), and education (GED) could perform any past relevant work if she were limited to performing jobs with no more than one, two, or three steps. (R. 272-72.) The VE testified that such an individual would not be capable of performing Campbell's past work of bookkeeping or installment loans. (R. 272.) Such an individual could, however, perform other manufacturing jobs available in the regional or national economy, including packaging (4,000 jobs); assembly (3,000 jobs); and sorting (3,000 jobs). (*Id.*)

On cross-examination, Campbell's attorney asked whether these jobs would remain available to an individual who is moderately limited in the ability to complete a normal workday or workweek without interruptions from psychologically-based symptoms or unreasonable rest periods. (R. 273.) The VE agreed that an individual must be capable of remaining on task for 90% of the workday in order to maintain employment in the manufacturing industry. The VE was not aware of any sedentary and non-manufacturing jobs available in the national economy. (*Id.*)

### E. The ALJ's Findings

The ALJ found that Campbell suffers from the severe impairments of anxiety disorder and panic attacks, but that she is capable of performing a variety of manufacturing jobs available in the national economy. (R. 16, 19.) The ALJ determined that Campbell's impairments do not meet or equal a listed impairment in 20 C.F.R. Part 404, Subpart P, Appendix I, noting the ME's testimony that Campbell can function in everyday life and has appropriate social interaction. (R. 17.) The ALJ agreed that Campbell is moderately limited in her ability to maintain social functioning, concentration, persistence, and pace, but concluded that she retains the residual functional capacity ("RFC") to perform one, two, and three-step jobs. In reaching this conclusion, the ALJ noted that Campbell was able to continue working between 2000 and 2004 despite her anxiety and

panic attacks, and observed that the only change that occurred in January 2004 was that she was laid off from work.  (R. 17-18.)

The ALJ found Campbell's testimony regarding the frequency, intensity, and limitations of her panic attacks to be "not entirely credible."  (R. 17.)  The ALJ noted that Campbell told Ms. Lake she had been experiencing panic attacks a couple times per month, but she testified at the hearing that she suffered a single panic attack in the three or four months before she was laid off from the bank.  (R. 18.)  The ALJ also stated that Campbell reported having only two panic attacks between April 7 and June 28, 2005.  (*Id.*)

The ALJ acknowledged Dr. Allen's August 9, 2005 report indicating that Campbell is too anxious to be able to perform work-related activities.  The ALJ afforded this opinion reduced weight, however, because it was based solely on Campbell's subjective complaints, and was inconsistent with Dr. Allen's additional findings that Campbell's symptoms are under fair control with Xanax, and that she (1) can perform activities of daily living; (2) has a normal relationship with her husband; (3) and has an essentially normal mental status, aside from a flat affect and feelings of anxiousness at times.  (R. 18.)  The ALJ similarly afforded reduced weight to Ms. Lake's opinion that typical work pressures would trigger anxiety and more panic attacks.  The ALJ again noted Dr. O'Brien's assessment that the medical record contained general inconsistencies, such as the fact that Campbell experienced panic attacks beginning in 2000 but kept working until she was laid off in 2004.  (*Id.*)

Considering that Campbell is an older person with a high school equivalency, the ALJ was satisfied that she can perform unskilled, sedentary work as a packager, assembler, or sorter, and that these jobs exist in significant numbers in the national economy.  Thus, the ALJ concluded that Campbell is not disabled within the meaning of the Act.  (R. 19-20.)

## DISCUSSION

### A.      Standard of Review

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the Social Security Act. *See* 42 U.S.C. § 405(g). In reviewing this decision, the court may not engage in its own analysis of whether Campbell is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (citation omitted). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* (citation omitted). The court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing 42 U.S.C. § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004).

Although this court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart*, 297 F.3d 589, 593 (7th Cir. 2002) (internal citations omitted). The court must critically review the ALJ's decision to ensure that the ALJ has built an "accurate and logical bridge from the evidence to his conclusion." *Young,* 362 F.3d at 1002. Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## B.    Five-Step Inquiry

To recover DIB under Title II of the Social Security Act, a claimant must establish that she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D. Ill. 2001). A person is disabled if she is unable to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905. In determining whether a claimant suffers from a disability, the ALJ conducts a standard five-step inquiry: (1) Is the claimant presently unemployed?    (2) Is the

claimant's impairment severe? (3) Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations? (4) Is the claimant unable to perform her former occupation? and (5) Is the claimant unable to perform any other work? *See* 20 C.F.R. §§ 404.1520, 416.920; *Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). In addition, the claimant must show that she had disability insured status at the time she became disabled. 20 C.F.R. § 404.131; *West v. Apfel*, No. 99 C 6235, 2000 WL 1847766, at *1 (N.D. Ill. Dec. 14, 2000).

## C.    Analysis

Campbell argues that the ALJ erred at steps two through five of the five-step inquiry. She insists that she has a disabling combination of impairments beyond anxiety and panic attacks, and argues that the ALJ failed to properly analyze whether these impairments meet or exceed a listing in the regulations. Campbell also objects that the ALJ was patently wrong in finding her testimony less than credible, and in finding her capable of performing one, two, and three-step jobs. The court addresses each argument in turn.

### 1.    Campbell's Impairments

#### a.    Combination of Impairments - Step Two

Campbell insists that the ALJ erred at step two of the five-step inquiry by failing to address her low back pain, esophageal reflux and obesity in combination with her other impairments. (Pl. Mem., at 9.) At step two, the ALJ is required to assess the claimant's physical impairments and determine whether "any impairment or combination of impairments . . . significantly limits [her] physical or mental ability to do basic work activities." *Unger v. Barnhart*, 507 F. Supp. 2d 929, 938 (N.D. Ill. 2007) (quoting 20 C.F.R. § 404.1520(c) and SSR 96-3). The ALJ did not mention low back pain, esophageal reflux or obesity in his decision, but there is little medical evidence in the record relating to any of these conditions.

Campbell reported to the emergency room on May 20, 2001 complaining of lower back pain radiating to her front and chest, associated with shortness of breath. The medical records contain

13

no evidence, however, of any related diagnostic tests or treatments. Nor are there any records suggesting that Campbell sought or obtained any further treatment for her back after May 2001. Similarly, though Campbell was diagnosed with esophageal reflux in August 2001, and the condition was confirmed in August 2003, the medical record contains no indication that the condition impacted her functioning in any way. Indeed, in August 2006, Dr. Allen recommended only that Campbell continue taking medications to help control her reflux. *See Johnson v. Sullivan*, 915 F.2d 1575 (7th Cir. 1990) ("[A] disability claimant bears the burden of producing objective medical evidence that demonstrates an impairment."); *Ali v. Barnhart*, No. 01 C 3768, 2003 WL 22232799, at *6 (N.D. Ill. Sept. 23, 2003).

The Seventh Circuit has made clear that "an ALJ should consider the effects of obesity together with the underlying impairments, even if the individual does not claim obesity." *Prochaska v. Barnhart*, 454 F.3d 731, 736 (7th Cir. 2006) (citing SSR 02-1p.) (*See also* R. 41.) The ALJ did not address Campbell's obesity, but he did discuss Dr. Allen's reports, which contain the only references to her BMI (38.42 on February 18, 2006 and 38.07 on June 9, 2006). (R. 18.) Notably, no medical opinion in the record identifies Campbell's obesity as aggravating or contributing to her physical limitations in any way. In addition, Campbell herself fails to "specify how [her] obesity further impaired [her] ability to work." *Prochaska*, 454 F.3d at 737 (quoting *Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004)). Thus, any error on the ALJ's part in failing to specifically mention Campbell's obesity was harmless. *Id.*

### b. Impairment Listings - Step Three

Campbell also objects to the ALJ's conclusion that her impairments do not meet or equal one of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix I (the "Listings"). *See* 20 C.F.R. § 404.1520(d). In Campbell's view, the ALJ erred in adopting the ME's conclusion in this regard without conducting his own analysis of the evidence. As a preliminary matter, Campbell has

never identified which Listing she believes she meets or equals in this case. *See Fischer v. Barnhart*, 309 F. Supp. 2d 1055, 1062 (N.D. Ill. 2004) ("In order to prove his impairment meets [a Listing], plaintiff must demonstrate that it satisfies the diagnostic description for the listed impairment.") To the extent the ALJ mentioned Listing 12.06 ("Anxiety Related Disorders") in his decision, however, the court assumes Campbell believes she meets or equals this Listing. Under the Regulations, Listing 12.06 is met when "the requirements in both A and B are satisfied, or when the requirements in both A and C are satisfied."[1]

Contrary to Campbell's assertion, the ALJ did consider the available evidence and articulate his reasons for finding that she did not meet or equal a Listing. The ALJ began his analysis by noting the ME's testimony that records from Campbell's treating physician indicate that she "can function in everyday life, as her activities of daily living and social functioning are appropriate." (R.

---

[1]    The specific A, B, and C criteria are as follows:

A. Medically documented findings of at least one of the following:
1. Generalized persistent anxiety accompanied by three out of four of the following signs or symptoms:
a. Motor tension; or
b. Autonomic hyperactivity; or
c. Apprehensive expectation; or
d. Vigilance and scanning;
   Or
2. A persistent irrational fear of a specific object, activity, or situation which results in a compelling desire to avoid the dreaded object, activity, or situation; or
3. Recurrent severe panic attacks manifested by a sudden unpredictable onset of intense apprehension, fear, terror and sense of impending doom occurring on the average of at least once a week; or
4. Recurrent obsessions or compulsions which are a source of marked distress; or
5. Recurrent and intrusive recollections of a traumatic experience, which are a source of marked distress;
   And
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.
   Or
C. Resulting in complete inability to function independently outside the area of one's home

17.)  Campbell makes much of the fact that the cited records are actually from state agency physician Carl Hermsmeyer from May 2005.  In Campbell's view, this demonstrates that the ALJ failed to weigh her treating psychologists' opinions and rejected evidence in the record supporting her claim of medical equivalency.  (Pl. Mem., at 11; Pl. Reply, at 3.)  None of Campbell's treating physicians, however, offered any opinion as to whether she met or equaled any Listing.

The ALJ went on to state that Campbell has "mild restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation." (R. 17.) These findings are consistent with those of Dr. Hermsmeyer, and demonstrate that Campbell does not satisfy the criteria in section B, which requires "marked" restrictions and difficulties in these areas.  Notably, these findings are also consistent with treating physician Dr. Allen's observation on August 9, 2005 that Campbell is able to perform activities of daily living by herself and has a normal relationship with her husband.  (R. 191-92.)  The ALJ finally observed that Campbell could not satisfy the C criterion, as there was no evidence that she has a complete inability to function outside of the home.  *See* Listing 12.06.

Campbell argues that the ALJ should have considered the A criterion as well, noting that she claims to have an irrational fear of death and germs.  (Pl. Mem., at 11.)  It is clear, however, that failure to satisfy both the B and C criteria mandates a finding that Listing 12.06 has not been met, regardless of criterion A.  *See* Listing 12.06.  As the Seventh Circuit has observed many times, an ALJ need not discuss every piece of evidence in the record as long as he "provide[s] some glimpse into [his] reasoning." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  Campbell also objects that the ALJ failed to explain why he "adopted" Dr. Hermsmeyer's finding that her panic disorder is not severe enough to meet or equal a Listing.  (Pl. Mem., at 11; R. 187.)  Campbell does not point to any specific evidence, however, suggesting that she does satisfy the medical equivalency requirement.   Under these circumstances, it was "unnecessary for the ALJ to

specifically articulate his reasons for accepting the consulting physicians' opinions on the question of medical equivalency." *Scheck v. Barnhart*, 357 F.3d 697, 701 (7th Cir. 2004) (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

### 2.     Campbell's Credibility

Campbell next claims that the ALJ erred in finding that her testimony regarding the frequency of her panic attacks was not fully credible. In assessing a claimant's credibility, an ALJ must first determine whether the symptoms are supported by medical evidence. *See* SSR 96-7p, at 2; *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007). If not, SSR 96-7p requires the ALJ to consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and other relevant evidence in the case record." *Id.* (quoting *Carradine v. Barnhart*, 360 F.3d 751, 775 (7th Cir. 2004)). *See also* 20 C.F.R. § 404.1529. The ALJ must provide specific reasons for the credibility finding, but hearing officers are in the best position to evaluate a witness's credibility and their assessment will be reversed only if "patently wrong." *Schmidt v. Astrue*, 496 F.3d 833, 843 (7th Cir. 2007); *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).

The ALJ found that Campbell's testimony regarding the frequency of her panic attacks was "greater than what is indicated by the medical records." (R. 17.) He supported this determination with a reasoned discussion of the record. For example, the ALJ noted that Campbell told Dr. Anwar in June 2005 that she had been experiencing panic attacks for a "couple" years, but that she told Ms. Lake in April 2005 that she had been experiencing them for "several" years. (R. 18, 164, 233.) Moreover, Dr. Allen indicated in March 2005 that Campbell had "followed with a psychiatrist and therapist" for several years, but the only records of such treatment begin on April 7, 2005.

The ALJ acknowledged the reports from Dr. Allen and Ms. Lake indicating that Campbell becomes too anxious and overwhelmed at work, and that work pressures would increase her

anxiety and trigger more panic attacks. (R. 18.) He reasonably discounted both of these opinions, however, as inconsistent with the record as a whole. The ALJ noted, for example, that in August 2005, Dr. Allen found Campbell able to perform her activities of daily living. Dr. Allen also determined that Campbell has essentially normal mental status, memory, and judgment except for a flat affect and anxiety about work and finances. He also stated that her symptoms are under fair control with Xanax, and that she is capable of managing her finances. (R. 18, 192-94.) By February 2006, moreover, Campbell had told Dr. Allen that the Xanax helped "a lot" with her anxiety, and that she did not feel the need to see a counselor or psychiatrist anymore. (R. 218.) In June 2006, Campbell presented to Dr. Allen with elevated blood pressure from a panic attack the previous day, apparently triggered by her return to work at a mortgage company in December 2005. (R. 223.) She requested a note to return to work, however, and though Dr. Allen recommended that she follow up with her psychiatrist, there is no indication in the record that she ever did. (R. 223, 226.) To the contrary, there are no treatment records for panic attacks beyond October 2005. (R. 18.) Nevertheless, at the July 2006 hearing, Campbell testified that she continues to experience disabling panic attacks at least twice per month. (R. 266.) *See Dixon*, 270 F.3d at 1178 ("An ALJ may properly reject a doctor's opinion if it appears to be based on a claimant's exaggerated subjective allegations.")

Like Dr. Allen, Ms. Lake found Campbell generally able to attend to her activities of daily living, including hygiene, grooming, meal preparation, some driving and shopping, and attending church. (R. 207.) Ms. Lake did find Campbell's mood to be low in October 2005 but, as noted, there are no treatment records past this date. By February 2006, moreover, she had told Dr. Allen that she no longer needed therapeutic care. The ALJ agreed with the ME that, despite the diagnosis of anxiety disorder with panic attacks, Campbell's treating physicians continuously found her to have high functionality. (R. 269.) The ALJ also found it significant that the ME observed nothing in the record – such as a change in medication or dosage – to explain why Campbell was

18

suddenly unable to work in January 2004. Campbell herself admitted at the July 2006 hearing that the only reason she stopped working at that time was because her entire department was laid off. In other words, her departure from the workplace had nothing whatsoever to do with her impairments as suggested in Campbell's December 4, 2004 Disability Report. (R. 17-18, 78, 251.) (R. 269.) Significantly, Campbell stated that she tried to go back to work immediately after the layoff, but that "nobody was hiring me then" and she became discouraged and decided to quit. (R. 258-59.) Also curious is the fact that Dr. Allen wrongly stated in March 2005 that Campbell had been unable to work for "the last two years" – i.e. since March 2003 – when she had worked until January 2004.

The ALJ did err in stating that Campbell reported having only two panic attacks between April 7 and June 28, 2005. (R. 18.) In fact, Campbell told Ms. Lake that she experienced panic attacks at least twice per month, though she was only admitted to the emergency room for the attacks on two or three occasions. (R. 207.) That said, Ms. Lake's counseling notes from October 6, 2005 indicate that Campbell had only two or three panic attacks during the several months prior to her October visits. (R. 231.) And, as noted, there are no treatment records for panic attacks past October 2005.

Campbell suggests that the ALJ's analysis was incomplete because he did not address the fact that in August 2005, Dr. Anwar gave her a GAF score of 45. (Pl. Reply, at 4.) The GAF scale, however, is not a diagnosis but is intended to be used to make treatment decisions. "Neither Social Security regulations nor case law require an ALJ to use a GAF score to determine the extent of an individual's disability." *Fisher v. Astrue*, No. 1:06-cv-1741-DFH-JMS, 2007 WL 4150314, at *6 (S.D. Ind. Nov. 14, 2007). Thus, the ALJ did not err by failing to discuss Campbell's GAF score. Nor did the ALJ err in failing to discuss Dr. Anwar's August 4, 2005 recommendation that Campbell continue taking Xanax and start taking Paxil for her anxiety and depression. (R. 233; Pl. Reply, at 4.) Dr. Anwar saw Campbell only once, and the ALJ did note Dr. Allen's August 9, 2005

assessment that (1) Campbell is able to perform activities of daily living by herself; (2) she has a normal relationship with her husband; and (3) her symptoms are under fair control with Xanax. (R. 18.) *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (an ALJ "need not discuss every piece of evidence in the record" as long as he does not ignore "an entire line of evidence that is contrary to the ruling.")

Reviewing the record as whole, the court concludes that the ALJ's credibility finding in this case was not "patently wrong." *Schmidt*, 496 F.3d at 843 (ALJ's credibility determination will not be disturbed "as long as [it] find[s] some support in the record.") Campbell's motion for summary judgment on this basis is denied.

### 3. The RFC Determination and VE Testimony

Campbell finally objects that the ALJ erred in finding her capable of performing one, two, and three-step packaging, assembly and sorting jobs. Campbell once again argues that the ALJ failed to consider all of her relevant impairments – a position already rejected by this court. Campbell also raises the issue of her GAF score, which is similarly not a basis for summary judgment. *See Fisher*, 2007 WL 4150314, at *6. The ALJ's RFC finding generally echoes Dr. Hermsmeyer's conclusion that Campbell "retains the mental capacity to perform simple one and two-step tasks at a consistent pace." (R. 187.) The ALJ did add that Campbell can perform three-step tasks, but he makes clear that in reaching this conclusion, he considered not only the objective medical and other evidence, but also opinion evidence and testimony regarding Campbell's symptoms. (R. 17.) *See Dixon*, 270 F.3d at 1178 (citing 20 C.F.R. § 404.1545); *McLachlan v. Barnhart*, No. 03 C 2297, 2004 WL 2036294, at *6 (N.D. Ill. Sept. 8, 2004) ("The determination of Plaintiff's RFC is reserved for the ALJ and it is a legal decision not a medical one.") The court is satisfied that the ALJ's determination that Campbell is capable of performing one, two and three-step jobs is supported by substantial evidence. *Young*, 362 F.3d at 1001.

The court is also satisfied that the ALJ posed an appropriate hypothetical question to the VE. "If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record." *Indoranto*, 374 F.3d at 474. Here, the ALJ asked whether Campbell could perform sedentary work available in the regional or national economy "[b]ased on the Claimant's age . . . here 53, education, GED, . . . [and] the following functional limitations. I have . . . 1, 2, and 3 step jobs, limited to that." The VE confirmed that there are 4,000 packaging jobs, 3,000 assembly jobs, and 3,000 sorting jobs available to Campbell. (R. 272-73.)

Campbell argues that the ALJ should have included her obesity in his hypothetical. (Pl. Reply, at 5.) As explained earlier, however, Campbell has presented no evidence that her obesity limited her ability to function in any way. Moreover, though the ALJ referenced section 204.00 of the Medical-Vocational Guidelines, which relates to "heavy work," he also agreed that Campbell is limited to performing sedentary work. (R. 19, 20.) Any error on the ALJ's part in failing to specifically mention Campbell's obesity was once again harmless. *Prochaska*, 454 F.3d at 737 (error in failing to address claimant's obesity was harmless where she failed to "specify how [her] obesity further impaired [her] ability to work.")

## CONCLUSION

For the reasons stated above, Campbell's motion for summary judgment [Doc. 16] is denied. The Clerk is directed to enter judgment in favor of the defendant.

ENTER:

Dated: February 29, 2008

_____
NAN R. NOLAN
United States Magistrate Judge